**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | |
|---|---|
| **In re:**<br>**New Horizons Health Systems, Inc.**<br>**d/b/a New Horizons Medical Center**<br>**d/b/a New Horizons Family Practice**<br><br>                    **Debtor.** | **Chapter 11**<br><br>**Case No. 15-30235 (GRS)** |

**DECLARATION OF BERNARD T. POE IN SUPPORT OF**
**FIRST-DAY MOTIONS AND APPLICATIONS**

I, Bernard T. Poe, hereby declare:

1.      I am the Chief Executive Officer of New Horizons Health Systems, Inc. (referred to herein as the "Company" or the "Debtor").  I am familiar with the day-to-day operations, business affairs, books and records of the Debtor.

2.      I submit this Declaration in connection with the voluntary chapter 11 petitions, first-day motions and applications of the Debtor in the above-captioned chapter 11 case.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Company, upon information supplied to me by counsel to the Debtor, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtor's operations, financial condition and related business issues.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and am authorized to submit this Declaration on behalf of the Debtor.

3.      Part I of this Declaration describes the business of the Debtor and the relevant background preceding the filing of these chapter 11 petitions.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtor

concurrently herewith.  I am familiar with the first-day motions and applications filed by the Debtor.

## I. <u>BACKGROUND</u>

### <u>History</u>

4.      The Debtor operates a hospital in Owenton, Kentucky. As such, the hospital is a "health care business" as that term is defined in § 101(27A) of the Bankruptcy Code. The hospital has served the counties of Owen, Gallatin, Carroll, as well as the surrounding areas since 1951. In 2001, the hospital earned designation as a "Critical Access Hospital" from the Centers for Medicare and Medicaid Services, because the hospital serves a rural area and provides 24/7 emergency services. This designation provides benefits, such as incentivized reimbursement from Medicare. Since that designation, the Debtor's operations have been able to offer the rural community it serves expanded services, including additional outpatient services such as physical therapy.

### <u>Corporate and Capital Structure</u>

5.      The Debtor is a Kentucky non-profit corporation.

6.      The Debtor is the obligor on a note with a pre-petition balance of approximately $4,333,845.91, plus accrued but unpaid interest, fees and other charges incurred thereunder (the "Pre-Petition Facility") with USDA Rural Development (the "Pre-Petition Lender") as the current noteholder, secured by all assets of the Debtor including cash and other amounts on deposit and cash proceeds from the disposition of any pre-petition collater (the "Pre-Petition Collateral").

### <u>Events Leading to Chapter 11</u>

7.      Over the last year, the Debtor has received interest in the sale of its assets, and the Debtor likewise is interested in consummating such a sale. Market conditions indicate that the

best way to sell its assets free and clear and to obtain the greatest recovery for the benefit of all creditors would be to utilize the chapter 11 protections and 363 sale process.

**Plans Going Forward**

8.     The Debtor intends to maintain operations until a sale can be consummated through the use of its receivables and the cash collateral of its Pre-Petition Lender.

## II.     FIRST-DAY MOTIONS

9.     The Debtor has requested various types of relief in "first-day" motions and applications (collectively, the "First-Day Motions") in order to minimize the adverse effects of the commencement of this chapter 11 case on its business.  I believe that a critical and necessary element in successfully administering this chapter 11 case is the approval of the Debtor's First Day Motions submitted concurrently herewith.  The factual background and support for each respective First Day Motion is set forth below.

### a)   Motion of the Debtor in Possession for an Order Scheduling Expedited Hearings on Certain First Day Motions

10.     By the above referenced motion (the "Expedited Hearing Motion"), the Debtor seeks entry of an order (i) scheduling an expedited hearing on certain first day motions (the "First Day Motions") and (ii) approving the form and manner of notice of the expedited hearing. Contemporaneously with the commencement of this chapter 11 case and the filing of this Declaration, the Debtor filed, among other things, the First Day Motions.

11.     I believe that the First Day Motions involve matters that require emergency and expedited hearings.  As described in detail in each of the First Day Motions, the relief requested is essential to obtain financing and to maintain the Debtor's operations and business throughout this chapter 11 case, as well as to administer this case in an efficient manner.  The First Day Motions are of the type heard on an emergency or expedited basis, and any delay in authorizing

the relief therein could have a severe and irreparable effect on the Debtor's operations and its transition into chapter 11.

12.     Although the Debtor seeks the scheduling of a hearing on the First Day Motions on the Commencement Date, and therefore without notice, prior to or immediately upon the filing of its chapter 11 petition the Debtor provided electronic or hard copies of the First Day Motions to  (i) the Debtor; (ii) counsel to the Debtor; (iii) counsel to Pre-Petition Lender; (iv) the Kentucky Department of Revenue; (v) the Internal Revenue Service; (vi) the Office of the United States Trustee, Eastern District of Kentucky; and (vii) the holders of the 30 largest unsecured claims (collectively, the "Initial Master Service List"); and (viii) those entities specifically affected by a specific motion.

13.     Accordingly, I believe an expedited hearing on the First Day Motions is warranted in this chapter 11 case and further believe the form and manner of notice is appropriate as detailed in the Expedited Hearing Motion and the appropriate relief should be granted.

     **b)  <u>Motion Of The Debtor-In-Possession For An Order (I) Authorizing, But Not Directing, The Debtor To (A) Pay Certain Prepetition Wages, Salaries, Bonuses And Other Compensation; (B) Continue Employee Benefit Programs In The Ordinary  Course Of Business; And (C) Pay Certain Reimbursable Expenses; (II) Authorizing, But Not Directing, The Debtor To Make Deductions From Employee Paychecks; And (III) Authorizing And Directing Banks And Other Financial Institutions To Pay All Checks And Electronic Payment Requests Made By The Debtor Relating To The Foregoing</u>**

**I.**     **EMPLOYEE OBLIGATIONS**

**<u>Unpaid Compensation</u>**

14.     The Debtor pays employees on a bi-weekly basis (a "Pay Period"), which runs from Sunday of the first week through Saturday of the second week, and is paid on the Friday following the end of the Pay Period.  The Debtor's average gross compensation for Employees,

including wages and salaries, during a pay period is approximately $136,930.00.  The payroll is made primarily by check with about a quarter of employees receiving payments via direct deposit through electronic transfer of funds directly to the Employees' accounts.

15.    As of the Commencement Date, the Debtor has not paid its Employees all prepetition wages, which, as noted, are held in arrears and paid every other Friday.  Additionally, compensation may be due and owing as of the Commencement Date because:

a.    some discrepancies may exist between the amounts paid and amounts Employees or others believe should have been paid, which upon resolution, may reveal that additional amounts are owed to such Employees;

b.    there may have been difficulties in completing an electronic fund transfer into an Employee's account;

c.    variations in the Debtor's various payroll records; and

d.    the Employee's checks may not have cleared the financial institution

16.    As the Debtor's payrolls run in arrears, the Debtor is asking for authority to pay such amounts owed, and are therefore estimating that, as of the Commencement Date, approximately $127,149.00 will be outstanding, which consists of accrued wages, salaries, overtime pay, and other compensation (excluding reimbursable expenses, vacation pay, and incentive bonuses) earned prior to the Commencement Date.

17.    The numbers reflected herein are for the amounts accrued but where no check or other payment has been made.  The Debtor's most recent bi-weekly payroll for hourly employees was for wages earned through May 16, 2015 and paid on Friday, May 22, 2015.  As a result, the Debtor has outstanding payroll obligations which have accrued from May 17, 2015 through the Commencement Date for Employees.   There are also checks that have likely not yet been deposited by the Employees arising from the most recent payroll.  The Debtor requests authority to continue to honor, in the ordinary course of business, any outstanding payroll checks for

current employees.  The Debtor does not believe any individual is owed in excess of $4,000.00 for accrued but unpaid wages.

18.      The payment of the prepetition Employee Wages and Benefits is necessary when compared with the size of the Debtor's estate and the damage to the Debtor's chapter 11 case that would ensue if Employee morale were disrupted by the Debtor's failure to meet its Employee Wages and Benefits obligations.

**Remitting and Paying Appropriate Deductions and Withholdings**

19.      The Debtor deducts certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, (b) other pre-tax and after-tax deductions payable pursuant to certain employee Benefits discussed herein (such as an Employee's share of health care Benefits, insurance premiums, 403(b) contributions, legally ordered deductions and other miscellaneous deductions), as well as (c) deductions for individual insurance programs selected by the Employees such as voluntary life insurance (collectively, the "Deductions").

20.      On average, each Pay Period, the Deductions total approximately $6,400.00 for Employees.  However, due to the commencement of this chapter 11 case, some of these Deductions may not have been deducted from the Employees' earnings and/or forwarded to the appropriate third-party recipients prior to the Commencement Date.  Accordingly, the Debtor seeks authority to continue to forward these prepetition Deductions (which are held in trust) to applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

21.      Further, the Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local taxing authorities, (the "Withheld Amounts").  On average, the Withheld Amounts total approximately $39,100.00 per Pay Period for Employees.

6

The Debtor must also match from its own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes"). The Employer Payroll Taxes, together with the Withheld Amounts, are referred to collectively hereafter as the "Payroll Taxes."

22.    Prior to the Commencement Date, the Debtor withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and reserved for the Employer Payroll Taxes. However, due to this chapter 11 filing, the Payroll Taxes may not have been forwarded to the appropriate taxing authority. As a result, the Debtor seeks authority, at its discretion, to continue to honor and process the prepetition obligations with respect to the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Commencement Date.

## II.    EMPLOYEE BENEFITS

23.    The Debtor provides Employees, in the ordinary course of business, with a number of Employee Benefits designed to assist its Employees and the Employees' eligible dependents in meeting certain financial burdens, including those arising from illness, disability, and death (collectively, the "Employee Benefits"), including but not limited to: (a) medical and dental insurance; (b) workers' compensation insurance; (c) vacation time and other paid absences; (d) 403(b) savings plan; and (e) other miscellaneous employee Benefits. The Debtor seeks authorization, but not direction, to pay or otherwise continue to honor these Employee Benefits, as described herein.

### Medical Plans

24.    The Debtor provides salaried employees who qualify under the medical plan policy with medical insurance, which is provided by United Healthcare (the "Medical Plan"). On a monthly basis, the Debtor, with contributions from the Employees, funds the Medical Plan.

The options under the Medical Plan provide a $1,000 Deductible, 80/20, with Maximum Out of Pocket: Single $1,000 in Network, $4,500 Out of Network, Family $2,000 In Network, $9000 Out of Network.

25.    The average monthly cost of the Medical Plan is $32,010.00. Employees' contributions total approximately $4,950.00 per month and the Debtor's contributions total approximately $27,060.00 per month. Thus the Debtor's contribution is approximately 85% of the overall cost of the Medical Plan.

26.    The Debtor pays the Medical Plan in advance and therefore believes that they do not have any accrued but unpaid, prepetition liabilities pertaining to the Medical Plan. In an abundance of caution, in the event of any unpaid amounts, the Debtor seeks Court approval to pay any amounts owed in the ordinary course of business. Further, there may be Medical Payments that have not yet cleared the bank. The Debtor also requests that such issued checks be permitted to be honored in the ordinary course of business. The Medical Plan is referred to hereinafter as the "Health Insurance."

27.    Employees rely on the Debtor to provide continuing health care Benefits. Employee welfare, morale and expectations would be significantly harmed if the Debtor were to fail in paying any amounts due with respect to the Health Insurance.

28.    Furthermore, and for similar reasons, the Debtor seeks to continue to provide continuation coverage under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B).

29.    The premiums for the COBRA coverage are paid by the Debtor. On a monthly basis, the Debtor collects approximately $-0- (no current COBRA participants) from the COBRA participants.

30.      By this Motion, the Debtor seeks authority, in its sole discretion to: (a) continue the Health Insurance for its Employees in the ordinary course of business; (b) continue making contributions to the Medical Plans; (c) pay any amounts related to the Health Insurance and the Employee Benefits, including any premiums, claim amounts and administrative fees, to the extent that such amounts remain unpaid on the Commencement Date; and (d) pay its COBRA obligations.

**Workers' Compensation**

31.      Pursuant to state laws, the Debtor must maintain workers' compensation liability coverage in the ordinary course of business.  As noted, the Debtor employs approximately 9 salary employees and 61 hourly employees at its hospital.

32.      The Debtor is insured through KESA for Workers' Compensation & Employer's Liability insurance.  There is a $0 deductible.  The Debtor pays a total annual premium of approximately $15,214.00.  Premiums are paid monthly in the amount of $1,268.00 and have been paid through June 1, 2015, with the next premium due July 1, 2015.

33.      By this Motion, the Debtor requests authority to continue to maintain its Workers' Compensation Program in the ordinary course of business and pay any prepetition amounts related thereto.

**403(b) Savings Plan**

34.      The Debtor sponsors a defined contribution plan, or 403(b) Plan, intended to qualify under § 403 of the Internal Revenue Code of 1986, as amended, (the "Code"), administered by Ameritas and Aspire.  All of the Debtors' Employees are eligible to participate in the 403(b) Plan if they are over 21 years of age (the "403(b) Plan").  Employees may contribute up to $16,500.00 to invest among various pre-selected investment alternatives. Employee contributions to the 403(b) Plan vest immediately.

35.    The Employees' contributions to the 403(b) Plan total approximately $2,750.00 per period for Employees. Currently, the Debtor estimates that there is approximately $-0- of accrued but unpaid prepetition liabilities pertaining to the Employees' contributions to the 403(b) Plan because Debtor's contributions are discretionary.  Of course, the Employees' contributions to the 403(b) Plan are not property of the bankruptcy estate, but constitute funds held in trust for the benefit of the Employees.  The Debtor requests to continue the 403(b) Plan for Employees, in its sole discretion, and in the ordinary course of business and to remit any prepetition amounts withheld thereunder.

**Miscellaneous Employee Benefits**

(i)    Employee Life, Accidental Death and Dismemberment Insurance, and Short and Long Term Disability Benefit Programs

36.    The Debtor offers certain Salaried Employees with certain life insurance and accidental death and dismemberment coverage (collectively, the "Life Insurance").  All eligible Employees who elect health insurance are provided Life Insurance policy at no cost to the Employees through Unum/Provident Life and Accident.  The average monthly cost of the Life Insurance policy paid by the Debtor is approximately $1,500.00.  Eligible Employees are also given the opportunity to purchase supplemental life insurance (the "Supplemental Life Insurance") coverage through Kansas City Life and Lincoln Life, with 100% of the cost funded by each participating Employee.  The average monthly cost of the Supplemental Life Insurance policy paid by the Debtor is $263.22.  By the Employee Wages and Benefits Motion, the Debtor seeks the authority to honor all commitments on the Life Insurance policy in the ordinary course of business, including remitting any payments that remain outstanding as of the Commencement Date.

37.     The Debtor provides the option for all Employees who elect health insurance are eligible for short term disability.  The short term disability insurance is funded by the Employee and provides up to 65% of weekly earnings up to $1,400.00 per week following the 14-day elimination period.  Long term disability insurance is provided to me and is funded by the Debtor, is paid quarterly by the Debtor in the amount of $1,078.00, and is currently paid until the next payment due in July 2015.

38.     By this Motion, the Debtor requests the authority to maintain the short and long term disability programs and to continue to pay prepetition expenses related to the disability programs.  In relation to the overall payroll obligations of the Debtor and the negative impact withholding payment would have on the affected Employees, it is in the best interest of the company to maintain the disability insurance programs.

(ii)     Flexible Spending Account

39.     The Debtor provides its Employees with a flexible spending account, pursuant to which some Employees maintain flexible spending account plans for healthcare and dependent care (the "Flexible Spending Plan").   Under the Flexible Spending Plan, Employees have amounts withheld from their paychecks on a pre-tax basis and placed into personal accounts. The funds can subsequently be used by the Employees for their healthcare and dependent care expenses such as deductible amounts.

40.     The average monthly Employee contribution to the Flexible Spending Accounts is $681.00.  The Debtor requests the authority, but not the direction, to continue the Flexible Spending Plan in the ordinary course of business.

### III.    ADMINISTRATIVE FUNCTIONS RELATED TO EMPLOYEE BENEFIT PLANS

41.    As is customary in most companies the size and complexity of the Debtor, the Debtor utilizes the services of several professionals and consultants in the ordinary course of its business in order to facilitate the administration and maintenance of its books and records related to certain of the Employee Benefits.    The Debtor utilizes the services of third-party administrators ("TPA's"), including ADP to manage its various Employee benefit programs, including but not limited to insurance, payroll processing, COBRA processing, the 403(b) Plan, and Employee Applications and Testing (the "Administration Expenses").    The amount the Debtor pays these professionals and consultants averages approximately $1,200.00 per month for ADP.

42.    These administrative services are necessary to the Debtor's administration of Employee Benefit Plans and ensure that the Debtor's multiple benefit programs are operated in the most cost-effective and efficient manner.    Accordingly, the Debtor requests that it be authorized, but not directed, to pay, in the ordinary course of business, the prepetition Administration Expenses owing to such TPAs.

43.    Finally, the Debtor seeks an Order authorizing and directing all banks to receive, process, honor and pay any checks, direct deposits and or wire transfers drawn upon the Debtor's payroll and general disbursement accounts related to Employee Wages and Benefits, or Administration Expenses, whether presented before or after the Commencement Date, provided that such funds are on deposit in the applicable amounts to cover such payments.

**c)** **Emergency Motion of the Debtor in Possession for an Order (A) Authorizing the Continued Use of the Debtor's Centralized Cash Management System and (B) Authorizing Maintenance of the Debtor's Existing Checks, Bank Accounts, and Business Forms**

44.      By the above-referenced motion (the "Cash Management Motion"), the Debtor seeks entry of an order:  (a) authorizing the continued use of the Debtor's existing centralized cash management system, (the "Cash Management System") and (b) authorizing maintenance of the Debtor's existing checks, bank accounts, and business forms.   The Debtor seeks this authorization to insure its orderly entry into bankruptcy and to help efficiently administer its business and avoid the disruptions and distractions that would inevitably divert the Debtor's attention from urgent matters during the initial stages of its bankruptcy case.

**(i)**      **The Cash Management System**

45.      The Debtor maintains a total of eight (8) bank accounts (the "Bank Accounts") at Peoples Bank and Trust and Farmer Bank (the "Banks") in the ordinary course of business.  The Bank Accounts include, without limitation, depository accounts, payroll accounts, and accounts payable accounts.   A true and correct list of the Bank Accounts, including the Banks, each Bank's address and the last four digits of the account numbers is attached to the Cash Management Motion as Exhibit A.

46.      The Cash Management System provides well-established mechanisms for the collection, distribution, and management of funds used in the Debtor's business.  The flow of cash begins with cash generated at the hospital.

47.      The Debtor's cash management reporting and accounting functions are systematic and include the necessary accounting controls to enable the Debtor to trace funds.  The Debtor maintains necessary records for its Cash Management System that identify the current balance of

its Bank Accounts. The Debtor will also be able to determine the amount of funds deposited into

or withdrawn from the Bank Account by the Debtor and will track the expenses that are satisfied.

48.    Accordingly, I believe the ability to maintain the current Cash Management

System is necessary to avoid disruption of the ongoing business operations and the relief as

requested in the Cash Management Motion should be granted.

**(ii)    Existing Bank Accounts, and Business Forms**

49.    The Debtor's business forms, letterhead and checks are all customized according

to its ordinary business needs. Because of the expense and disruption that would be incurred by

the formulation of new forms containing the designation "Debtor in Possession," I believe it is in

the best interest of the estate for the Debtor to continue to use its customized forms, and

letterhead during the course of this chapter 11 case without placing the label "Debtor in

Possession" on each separate check or form.

50.    In addition, the Debtor seeks a waiver of the requirement that new bank accounts

be opened to replace all of the Debtor's existing Bank Accounts because such a requirement

would unnecessarily disrupt the Debtor's business, impair its efforts to reorganize successfully

and not provide any significant benefit to the Debtor's estate, its creditors or other parties in

interest. I believe it is critical to the continued operation of the Debtor's business and the

preservation of the value of its assets that the existing cash management system and Bank

Accounts continue to be utilized without disruption.

51.    In the ordinary course of business, the Debtor uses many pre-printed

correspondence and business forms. I believe the nature and scope of the Debtor's business and

the numerous suppliers of goods and services require that the Debtor be permitted to continue

using its existing pre-printed correspondence and business forms without alteration or

modification. Changing correspondence and business forms would be unnecessary and

burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations. I believe parties doing business with the Debtor will undoubtedly be aware of the Debtor's status as Debtor in possession.

52.     Furthermore, the filing of the Debtor's bankruptcy petitions will undoubtedly be publicized within the business community, which I believe will place a strain on the Debtor's relationships with its customers, vendors and other creditors that are essential to its continued operations. If the Debtor is required to substitute new debtor in possession bank accounts for its existing Bank Accounts, these relationships will be further strained by the payment delays and confusion that would result from opening the new accounts. Consequently, I believe that it is imperative that the Debtor be permitted to continue using the existing Bank Accounts to avoid such unnecessary disruption of its business, efficiently administer its bankruptcy case and devote its efforts to a successful reorganization. Although the Debtor seeks authorization to utilize and retain its existing checks and bank accounts, the Debtor will maintain its books and records so as to provide a clear line of demarcation between prepetition and post-petition transactions and operations. The Debtor further represents that if the proposed relief is granted, it will not pay, and each of the Banks will be directed not to pay, any debts incurred before the Commencement Date, other than as authorized by this Court.

**d)  Motion of the Debtor for Entry of an Order Under 11 U.S.C. §§ 105(A) and 366 (I) Preventing Utility Companies From Discontinuing, Altering, Refusing Service, (II) Establishing Procedures for Determining Adequate Assurances of Payment, and (III) Establishing Procedures for the Utility Companies to Opt Out of the Debtor's Proposed Procedures for Adequate Assurance**

53.     By the above referenced motion (the "Utilities Motion"), the Debtor seeks entry of an order (a) determining that its Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed procedures for Utility Providers to request additional or

different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to seek to opt out of the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by the Utilities Motion, pending entry of a final order approving same.

54.     In connection with the operation of its business and the management of its properties, the Debtor purchases utility services (collectively, the "Utility Services") from various providers (collectively, the "Utility Companies").  Attached as <u>Exhibit A</u> to the Utilities Motion is a nonexclusive list of substantially all of the Utility Companies that were providing Utility Services to the Debtor as of the Commencement Date.[1]

55.     I believe that if the Utility Companies are permitted to terminate Utility Services on the thirty-first day after the Commencement Date, there will be severe disruptions in the Debtor's business affairs.  Further, to avert such harm, the Debtor would be required to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of necessary Utility Services.

56.     If Utility Services to the Debtor's hospital, and administrative facilities were interrupted, the Debtor would no longer be able to operate its business, could be in violation of its lease terms, and could suffer irreparable harm.  Any loss of Utility Services could result in the loss of significant sales and resulting irreparable harm to the Debtor's relationships with its

---

[1]   Although the Debtor has exercised its best efforts to list all of the Utility Companies on <u>Exhibit A</u> to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from such exhibit.  Accordingly, the Debtor requests that any relief granted pursuant to this Utilities Motion apply to any

customers, and the loss of goodwill in the marketplace.  Simply put, without the Utility Services, the Debtor's operations will shut down.

57.    The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers in a timely manner.  Further, the Debtor expects that available cash collateral will be more than sufficient to pay all postpetition utility obligations.

58.    Nevertheless, the Debtor proposes to provide adequate assurance to the Utility Providers by making a deposit equal to two weeks of utility service, calculated as a historical average during the most recent calendar year, to each Utility Provider as interim adequate assurance (the "Adequate Assurance Deposit") within seven business days of the first day hearing (the "First Day Hearing"), provided that such Utility Provider is not currently paid in advance for its services.

59.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

60.    In light of the severe consequences to the Debtor of any interruption in Utility Services, but recognizing the right of Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtor is proposing procedures in the Utilities Motion that will enable the Debtor to cooperatively work with the Utility Providers in a coordinated manner to consensually resolve adequate assurance issues.  If the Debtor and a Utility Provider cannot consensually resolve such issues, I am informed by counsel that the Court should determine first whether an additional adequate assurance payment is necessary and, if so, how

Utility Company that provides Utility Services to the Debtor, whether or not any such Utility Company is identified on Exhibit A to the Utilities Motion.

much it should be so that the Utility Provider will not cease performance for failure of adequate assurance.  The procedures that the Debtor proposes to effectuate this result are set forth in detail in the Utilities Motion (the "Adequate Assurance Procedures").  I believe it is prudent to require Utility Providers to raise any objections to the Adequate Assurance Procedures so that such objections may be heard by the Court before the running of the 30-day period following the Petition Date in order to avoid a potential hostage situation.

61.     Lastly, the Debtor has made an extensive and good faith effort to identify its Utility Providers and include them on the Utility Service List.  Nonetheless, it is possible that the Debtor has not yet identified or included certain Utility Providers on the Utility Service List.  To the extent that the Debtor identifies additional Utility Providers, the Debtor will file amendments to the Utility Service List, and shall serve copies of the Order on such newly identified Utility Providers.  The Debtor requests that the order be binding on all Utility Providers, regardless of when such Utility Provider was added to the Utility Service List.

62.     Based on the foregoing reasons, I believe and submit that an order granting the relief requested in the Utilities Motions is in the best interest of the Debtor, its estate, its creditors and other parties in interest.

### e)  Motion Of The Debtor For An Order Pursuant To Bankruptcy Code Sections 105, 363, 364, 1107 And 1108, And Bankruptcy Rule 6003 Authorizing The Debtor To Maintain Insurance Policies, Pay Insurance Obligations, And Renew Insurance Policies

63.     By the above-captioned Motion (the "Insurance Motion"), the Debtor seeks entry of an order authorizing, but not directing, the Debtor to:  (a) maintain its various insurance policies (collectively, the "Insurance Policies") and to pay all premiums, brokers' fees, administration fees, and consulting fees, (the "Insurance Obligations"), arising under or in connection with the Insurance Policies which the Debtor has obtained through several third-party

insurance carriers (collectively, the "Insurance Carriers"), including any Insurance Obligations

for prepetition periods, and (b) enter into new insurance policies, as the Debtor, in its discretion,

deems necessary and appropriate to ensure adequate insurance coverage.

### A.      Insurance Policies and Obligations

64.      In connection with the operation of its business and management of its hospital,

the Debtor maintains numerous Insurance Policies.  The Insurance Policies include coverage for,

among other things, property liability, general and professional liability, excess general and

professional liability, workers' compensation, and other miscellaneous coverage.  A list of

insurance policies is attached to the Insurance Motion as Exhibit A.  I believe the third-party

claims that are covered by the Insurance Policies are neither unusual in amount nor in number in

relation to the extent of the business operations conducted by the Debtor.

65.      To the extent that any Insurance Policy premiums or losses paid on Debtor's

behalf and billed to Debtor may be attributed to prepetition insurance coverage, I believe that

payment of such Insurance Policy premiums is necessary to ensure continued coverage under

such Insurance Policies and to maintain good relationships with the Debtor's insurers.[2]

Similarly, I believe that continued payment of Insurance Policy premiums as such premiums

come due in the ordinary course of the Debtor's business is necessary.  The Debtor's

maintenance of its relationships with its insurers is critical to ensuring the continued availability

of insurance coverage and reasonable pricing of such coverage.

66.      Certain of the insurance policies require that the Debtor pays a deductible or a

self-insured retention payment in connection with individual claim occurrences.  Accordingly,

the Debtor intends to continue making such payments on account of post-petition losses, if any,

to the extent the Debtor determines such payments are necessary to avoid impairment to the coverage, benefits, or proceeds provided under the insurance programs.

67.     As of the Commencement Date, the Debtor does not believe there are any outstanding premiums in connection with the Insurance Policies**.**   As described herein, continuation of the insurance coverage and insurance policies is essential to the ongoing operations of the Debtor's business.  Accordingly, the Debtor intends to maintain appropriate levels of insurance with respect to the aforementioned categories of insurance policies at all times and I believe approval of the Insurance Motion is in the best interest of the Debtor, its estate, and parties-in-interest.

**f)    Motion of the Debtor in Possession for an Order Establishing Certain Special Notice Procedures and Master Service List Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure**

68.     Under the above-referenced motion (the "Notice Procedures Motion"), the Debtor seeks an administrative order of this Court establishing certain special notice procedures and a master service list pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

69.     I believe the relief requested by the Notice Procedures Motion is necessary to ensure the efficient administration of this chapter 11 case while ensuring that all parties with significant interests in these proceedings have an opportunity to be heard.

70.     The Notice Procedures motion proposes establishing a Master Service List (as defined in the Notice Procedures Motion) that would limit the service of most filings in this case upon a core list of parties in interest and provide authorization for electronic service.

---

[2] The Debtor believes that it is current on all insurance premium obligations. Nonetheless, out of an abundance of caution, the Debtor seeks express authority to make payments for any insurance premium obligations that may be attributed to prepetition insurance coverage.

71.     I believe that, for several reasons, it is necessary and appropriate to adopt the procedures proposed in the Notice Procedures Motion.  First, providing notice of all matters in this case to all of the parties who would otherwise be entitled to notice would actually delay the provision of notices and would be unjustifiably burdensome and uneconomical.  It would also place an enormous administrative burden on the Debtor's estate and would impede the consummation of transactions, negotiation of settlements and the granting of other relief that may be advantageous to the estate and its creditors.  Furthermore, providing notice of all matters to all of the entities otherwise entitled to notice of such matters would unnecessarily increase the costs of administering this case and, in many instances, delay service to these institutions.

72.     Based on the above, I believe that the proposed notice procedures will mitigate the administrative burden that would otherwise be imposed upon the Debtor's estate without diminishing creditor participation

g)  **Motion of Debtor for an Order Granting Extension of Time for Filing Schedules and Statements**

73.     In the above referenced-motion (the "Schedules Motion"), the Debtor seeks the entry of an order substantially in the form attached hereto extending the time for the filing of its Schedules and Statement of Financial Affairs to June 19, 2015, without prejudice to the Debtor's ability to request additional time should it become necessary.

74.     I believe that, in light of the complexity of the Debtor's operations, and the urgency of this filing, an extension of time to file the Debtor's Schedules and Statement of Financial Affairs is warranted. Additionally, I submit that the Debtor's creditors and other parties in interest will not be prejudiced by this modest three week extension.  The meeting under Bankruptcy Code section 341 has not yet been scheduled.  If the deadline to file the Debtor's Schedules and Statement is extended to June 19, 2015, as requested herein, the Schedules and

Statement will be filed in sufficient time prior to the meeting under Bankruptcy Code section 341. Such extension will also help ensure that the Schedules and Statement are properly prepared, reducing the risk of error and improving reliability.

75.     For the reasons stated above, cause exists in this instance to grant an extension of time to file the Schedules and Statement of Financial Affairs.

**h) Application Pursuant to Fed. R. Bankr. P. 2014(a) For An Interim and Final Order Under Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Dinsmore & Shohl As Counsel For the Debtor in Possession**

76.     By the above referenced "Dinsmore Application", the Debtor seeks to employ and retain the firm of Dinsmore & Shohl LLP ("D&S" or the "Firm") as its counsel with regard to the filing and prosecution of this chapter 11 case and all related matters, effective as of the Commencement Date. Accordingly, the Debtor respectfully requests entry of an order authorizing it to employ and retain the Firm as its general bankruptcy counsel under a general renewing retainer to perform the legal services that will be necessary during this chapter 11 case.

77.     D&S is well qualified to represent the Debtor. In preparing for this case, D&S has become familiar with the Debtor's business affairs and many of the potential legal issues that may arise in connection with these this 11 case. D&S also has knowledge of the Debtor's business, financial affairs and capital structure. In selecting D&S as its general bankruptcy counsel, the Debtor considered D&S's intimate knowledge of the Debtor's operations and finances and its expertise and experience in reorganization and bankruptcy law. I understand that D&S has served as counsel to debtors and creditors in various bankruptcy cases. In addition, the D&S attorneys responsible for representing the Debtor in matters related to its reorganization are members of D&S's restructuring, reorganization and bankruptcy department, with substantial experience in a wide range of bankruptcy cases.

78.    The Firm's depth of experience in business reorganizations and its familiarity with the Debtor makes D&S uniquely qualified to deal effectively with the legal issues that may arise in the context of the Debtor's reorganization.  Therefore, the Debtor believes that D&S is well qualified to serve as its bankruptcy counsel and that retention of D&S is in the best interest of the estate.

79.    I believe the Firm's services are necessary to enable and assist the Debtor in performing its duties as Debtor-in-Possession relating to the day-to-day operations of the company as well as all bankruptcy specific matters.

80.    Accordingly, I respectfully submit that authorizing the Debtor to employ and retain D&S as attorneys for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

**i)    Application For an Interim and Final Order Authorizing the Employment and Retention of Kelley S. Gamble, CPA As Accountant and Advisor Pursuant to Section 327(a) of the Bankruptcy Code**

81.    By the above referenced "Gamble Application", the Debtor seeks to employ and retain Kelley S. Gamble, CPA ("Gamble") to perform the services necessary to the successful administration of this chapter 11 case, as accountant and advisor.

82.    The Debtor has selected Gamble because Gamble has previously worked with the Debtor and is therefore familiar with the Debtor's finances and operations. Gamble also is qualified to perform the services required in this case.  I believe the retention and employment of Gamble is in the best interests of creditors and the best interests of the estate.

83.    All the services that Gamble will provide to the Debtor will be: (i) at the request of the Debtor, (ii) appropriately directed by the Debtor so as to avoid duplicative efforts among the professionals retained in the case, and (iii) performed in accordance with applicable standards of the accounting profession.

84.    Accordingly, I respectfully submit that authorizing the Debtor to employ and retain Gamble as accountant and advisor for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

### III.    CONCLUSION

85.    In order to preserve and maximize the value of its business and successfully reorganize, the Debtor's immediate goal is to engage in business as usual following the commencement of this chapter 11 case.  I believe that, if the Court grants the relief requested in each respective First Day Motion, the prospect of achieving these objectives will be substantially enhanced to the benefit of the Debtor's estate, its creditors and other parties in interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 29th day of May, 2015.

/s/ Bernard T. Poe
Bernard T. Poe
Chief Executive Officer,
New Horizons Health Systems, Inc.

9654667v4